[No. 35822.   *En Banc.*   August 17, 1961.]

ARTHUR SCHMIDT *et al.*, *Appellants*, v. OLD UNION
STOCKYARDS COMPANY, *Respondent.*

NORTHWEST LIVESTOCK AUCTION COMPANY, INC., *Appellant*,
v. OLD UNION STOCKYARDS COMPANY, *Respondent.*

CHARLIE KINN, *Appellant*, v. OLD UNION STOCKYARDS
COMPANY, *Respondent.*

GRANGE INTERSTATE LIVESTOCK ASSOCIATION, *Appellant*, v.
OLD UNION STOCKYARDS COMPANY, *Respondent.**

*Reported in 364 P. (2d) 23.

*Kizer, Gaiser, Stoeve, Layman & Powell, Benjamin H. Kizer,* and *Daniel W. Gaiser,* for appellants.

*Keith, Winston & Repsold (Leo J. Driscoll* and *Cummings, Sellers, Reeves & Conners,* of counsel), for respondent.

OTT, J.—The Old Union Stockyards Company of Spokane is licensed by the Secretary of Agriculture to engage in the stockyard business, as provided by 7 U. S. C. §§ 181-231. By the rules and regulations for stockyards, the Secretary of Agriculture has recognized two methods of selling livestock, one known to the industry as "private treaty," and the other as "auction." For nearly thirty years prior to June 1, 1959, the Old Union Stockyards Company conducted its sales operation under the private treaty method through market agencies, with a public auction of livestock one day each week.

Market agencies are likewise required by the act (7 U. S. C. § 203) to qualify and be licensed by the Secretary of Agriculture to engage in the selling of livestock in a licensed stockyard. The market agencies, functioning as "commission men," negotiate with prospective buyers for a private sale of the producers' livestock. The stockyard function, under the private treaty method, is largely to furnish the facilities, feed, and care for the producers' livestock pending the negotiations for sale.

In 1959, the Old Union Stockyards Company conducted an analysis of livestock market conditions in the Spokane

area and concluded that a more effective and economical method of operation for the producer, consumer, and the stockyard company would be to change its sales operation to the auction method. Under the auction method, livestock is consigned to the stockyard company for the purpose of sale, and prospective buyers bid at a regular public auction sale on the stock offered.

The Old Union Stockyards Company petitioned the Secretary of Agriculture for permission to change its method of sale and for approval of a new tariff incident to the auction sale method. The Secretary gave the required notice of hearing, granted the petition, and fixed the tariff for the auction sale method for the stockyard company's operations in Spokane. The tariff became effective June 1, 1959. The adoption of the "auction" method of sale eliminated the need for the services of the market agencies.

Arthur Schmidt and his sons, who for many years had conducted a market agency within the Old Union Stockyards, and three other market agencies which were also doing business within the Old Union Stockyards, filed, in accordance with the provisions of the act, informal complaints with the Secretary of Agriculture as follows:

"INFORMAL COMPLAINT

"To THE ADMINISTRATOR, PRODUCTION AND MARKETING ADMINISTRATION OF THE DEPARTMENT OF AGRICULTURE:

"ARTHUR SCHMIDT, REUBEN SCHMIDT and EARL SCHMIDT, doing business as SPOKANE LIVESTOCK COMMISSION COMPANY; C. N. KINN, doing business as CHARLEY KINN COMMISSION Co., and GRANGE INTERSTATE LIVESTOCK ASSOCIATION; all of whose addresses are Spokane, Washington, and who will collectively hereinafter be referred to as the Complainants, hereby make informal complaint against OLD UNION STOCKYARDS Co., a Washington corporation, whose address is East 3810 Boone Avenue, Spokane 24, Washington, and whose telephone number is Keystone 5-2444.

"The basis of this complaint is that the said Old Union Stockyards Co. has given notice that effective June 1, 1959, the *entire operations* at the Old Union Stockyards Co., Spokane, Washington, including the buying and selling of livestock (formerly done by commission companies on a private treaty basis with a Wednesday auction) *will*

*be changed* from that basis *to a stockyard operated exclusively by auction and such auction will be conducted solely by the stockyard company itself.* A copy of the notices to effect such arrangements are attached hereto, being letters dated March 24, 1959, and April 7, 1959, both addressed to Reuben Schmidt, Spokane Livestock Commission Company.

"The complainants, Spokane Livestock Commission Company, and other commission merchants and market agencies duly registered and licensed under the Stockyards Act, have been in operation for many years using the facilities and services of the Old Union Stockyards Co. Spokane Livestock Commission Company has so operated continuously since about 1930, and the Charley Kinn Commission Co. has so operated for about ten years. Such operations have been under rules and regulations of the Old Union Stockyards Co. issued from time to time. On March 27, 1959, there was issued 'Tariff No. 1' purporting to eliminate all dealing in livestock at the Old Union Stockyards Co. premises, on a commission or private treaty basis, the Old Union Stockyards Co. assuming to act as the 'sole selling agency'.

"*The effect of the said purported tariff revision, if it is permitted to go into and remain in effect is*:

"(a) That the Old Union Stockyards Co. would *preempt all of the livestock purchase and sale business* which has been developed by Spokane Livestock Commission Company (and all other operators) over a long period of years. This intention is borne out by notices, widely circularized, and extensive advertising by Old Union Stockyards Co. to all shippers and prospective shippers urging and directing them to consign all livestock for handling by Old Union Stockyards Co.

"(b) Such action would completely *deprive the livestock feeders, handlers and shippers from an extensive area* in Montana, Idaho, North Dakota, South Dakota, Wyoming and Washington, *who have used these facilities in reliance upon the private treaty method of selling* (which many of them prefer) from selling by such method and *would force them to rely solely upon the auction method of selling* through one selling agency only, namely, Old Union Stockyards Co. The auction method has been tried at Old Union Stockyards Co. in the past and proved unsuccessful and unpopular with the feeders and shippers and producers.

"(c) Such action, if permitted, would have the effect

of depriving these complainants and others of businesses which they have developed over a long period of years and of turning such businesses over to Old Union Stockyards Co.

"(d) *Such action, if permitted, would be contrary to the letter and spirit of the Stockyards Act of 1921* in that it would be conducive to abuses, which were sought to be corrected by that legislation; namely a single control over substantially all of the livestock selling facilities in the entire area, which would lend itself to discrimination, *monopoly* and collusion among possible purchasers, particularly the packers, and would result in restrictions on the free movement of livestock from the ranges and feeding lots to the ultimate markets.

"(e) *Such action would be contrary to the law and the regulations of the Department of Agriculture pursuant thereto requiring stockyard owners to furnish reasonable stockyard facilities and service without discrimination.* Such *practice* would be *monopolistic* and discriminatory in that it would permit only one type of sale by one party and would constitute an *unfair practice* in this terminal market.

"(f) *Such practice, if permitted, would inflict severe financial damage upon these complainants* and others and would deprive them of their businesses without proper compensation and without giving them an opportunity under the circumstances to take their business with them, since there are no other suitable stockyard facilities in the entire area and since it has been and is impossible in the short interval of time allowed to provide any such other facilities.

"(g) Such action, if permitted, would deprive the owners, producers, shippers and feeders of livestock, of one of the services to which they are entitled from a stockyards company under the Stockyards Act, namely the right to have a proper selling service by properly qualified and licensed commissioned merchants and market agencies by the method such producers and shippers prefer and by such persons as they have become accustomed to deal with and with whom they desire to deal.

"These complainants, therefore, request the proper authorities *to prevent* the Old Union Stockyards Co. from placing in effect the said Tariff No. 1 on June 1, 1959, or any other date; or in the alternative *to delay* the effective date of such proposed tariff a sufficient time to reasonably enable the complainants to obtain other facilities for the

handling of livestock for farmers, producers, feeders and shippers; or in the alternative *to award to these complainants all damages* which have been and which may be sustained by reason of the action of the said Old Union Stockyards Co.

"Done at Spokane, Washington, May 15, 1959.

"SPOKANE LIVESTOCK COMMISSION COMPANY
By [signed] Reuben Schmidt
By [signed] Arthur Schmidt
By [signed] Earl H. Schmidt
"CHARLEY KINN COMMISSION Co.
By [signed] C. N. Kinn
"GRANGE INTERSTATE LIVESTOCK ASSOCIATION
By [signed] F. G. Eldridge, Manager"
(Italics ours.)

After investigating the condition of the Spokane market, pursuant to the allegations of the complaints, the Chief of the Packers and Stockyards Branch, acting for the Secretary of Agriculture, denied the relief requested for the reason that the facts alleged in the complaints did not constitute a violation of the Packers and Stockyards Act, and gave notice that a formal complaint could not be filed. The written notice of denial to the complainants concluded with the following statement: " 'Of course, this does not in any way prevent the complainant from pursuing any other remedy provided by law.' "

Subsequent to receiving notice of the Secretary's ruling, three of the four market agencies petitioned the Secretary to reopen and reconsider it. The Secretary granted the request, made a second investigation of the issues raised by the informal complaints and petition for reconsideration, and again denied the relief sought. Before the Secretary had announced his ruling on the petition for reconsideration (December 10, 1959), all four market agencies filed complaints in the superior court for Spokane county, alleging essentially the same facts contained in their administrative complaints, seeking the same relief, and charging, *inter alia,* that the Old Union Stockyards Company had unlawfully and tortiously appropriated the plaintiffs' businesses and customers, with the intent to create a

monopoly. The defendant's motion to remove the causes of action to the United States district court was granted. Subsequently, upon the plaintiffs' motion, the causes were remanded by the district court to the Spokane county superior court.

The defendant moved for dismissal of the complaints upon the ground that the superior court had no jurisdiction of the subject matter of the actions, and that the complaints failed to state a claim upon which relief could be granted. In the alternative, the defendant moved for summary judgments upon the same grounds.

The trial court expressed some doubt as to its jurisdiction. Nevertheless, after considering the pleadings and the documents on file, it granted defendant's motion for summary judgments.

The plaintiffs have appealed and, by stipulation of the parties, the four causes have been consolidated for appellate review.

The appellants state in their brief that, "As we see it, the fundamental error of the Trial Judge lies in the fact that he assumed that the 'primary jurisdiction' [rule] is controlling here."

◼ In *United States v. Western Pac. R. Co.*, 352 U. S. 59, 1 L. Ed. (2d) 126, 77 S. Ct. 161 (1956), the United States supreme court, in defining the limits of the doctrine of primary jurisdiction, stated:

" . . . *'Primary jurisdiction,'* . . . applies where a claim is originally cognizable in the courts, and *comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body*; in such a case *the judicial process is suspended* pending referral of such issues to the administrative body for its views." (Italics ours.)

See, also, 3 Davis, Administrative Law Treatise, 1, § 19.01 *et seq.*

The Packers and Stockyards Act, 7 U. S. C. §§ 181-231, bestows upon the Secretary of Agriculture the duty to regulate the services provided by stockyards and market

agencies, which are required to be registered under the act, and to regulate the practices in which such stockyards and market agencies may engage. Section 207 (e) of the act provides in part:

"Whenever there is filed with the Secretary any schedule, stating a new rate or charge, *or a new* regulation or *practice affecting any rate or charge,* the Secretary may . . . enter upon a hearing concerning the lawfulness of such rate, charge, regulation, or *practice,* . . ." (Italics ours.)

Section 208 of the act provides:

"It shall be the duty of every stockyard owner and market agency to establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices in respect to the furnishing of stockyard services, and *every unjust, unreasonable, or discriminatory* regulation or *practice is prohibited and declared to be unlawful.*" (Italics ours.)

Section 209 of the act provides:

"(a) If any stockyard owner, market agency, or dealer violates any of the provisions of sections 205-207 or 208 of this title, or of any order of the Secretary made under sections 201-203 and 205-217a of this title, he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation.

"(b) Such liability may be enforced either (1) by complaint to the Secretary as provided in section 210 of this title, or (2) by suit in any district court of the United States of competent jurisdiction; but this section shall not in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."

5 U. S. C. § 1032 provides in part:

"The court of appeals shall have exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of, all final orders . . . (b) of the Secretary of Agriculture made under the Packers and Stockyards Act, 1921, as amended, . . . .

"Such jurisdiction shall be invoked by the filing of a petition as provided in section 1034 of this title."

5 U. S. C. § 1034 provides:

"Any party aggrieved by a final order reviewable under

this chapter may, within sixty days after entry of such order, file in the court of appeals, wherein the venue as prescribed by section 1033 of this title lies, a petition to review such order. Upon the entry of such an order, notice thereof shall be given promptly by the agency by service or publication in accordance with the rules of such agency. The action in court shall be brought against the United States. The petition shall contain a concise statement of (a) the nature of the proceedings as to which review is sought, (b) the facts upon which venue is based, (c) the grounds on which relief is sought, and (d) the relief prayed. The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency. The clerk shall serve a true copy of the petition upon the agency and upon the Attorney General of the United States by mailing by registered mail, with request for return receipt, a true copy to the agency and a true copy to the Attorney General."

It is clear from reading the cited sections of the Packers and Stockyards Act that Congress has entrusted to the Secretary of Agriculture the duty to regulate "practices" and methods of operation by those required to be registered under the act, and thereby attain uniformity in the sale of livestock through the media of licensed stockyards. It is likewise clear that adequate provisions have been established to insure judicial review of the acts of the Secretary.

■ ■ The essence of the appellants' administrative complaints, and of their complaints filed in the Spokane county superior court, is that, when the Secretary allowed a change from the "private treaty" method of selling to the "auction" method, the appellants were damaged. The method of sale of livestock is a "practice," and, as such, falls within the special competence of the Secretary of Agriculture to permit or deny the exercise of the method or practice. The determination of authorized "practices" involves a question of fact and discretion in a technical matter, which rests within the primary jurisdiction of the Secretary of Agriculture, rather than that of the courts. *Kelly v. Union Stockyards & Transit Co. of Chicago*, 190 F. (2d) 860 (1951).

■ The appellants' complaints filed in the superior

court charged that the adoption of the "auction" method was detrimental to the economic interests of the entire livestock industry, and that, as a result thereof, they suffered monetary damages. The allegations constitute an attack upon a "practice," and, because a "practice" is established only after the Secretary has made a study and analysis of the industry, any issue arising therefrom must be resolved by the Secretary. One aggrieved by the Secretary's decision must seek its review by the statutory methods provided.

Applying the rule announced in the *Kelly* case, we hold that the allegations contained in the complaints in these causes of action must be addressed to the Secretary of Agriculture.

█ The appellants contend that the following provision of 7 U. S. C. § 209 precludes the application of the primary jurisdiction doctrine:

". . . but this section shall not in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."

In *Denver Union Stock Yard Co. v. Producers Livestock Marketing Ass'n*, 356 U. S. 282, 2 L. Ed. (2d) 771, 78 S. Ct. 738 (1958), the United States supreme court had before it a case involving the Packers and Stockyards Act, and there stated:

". . . The institution of the exclusive agency is, of course, well known in the law; and the legal problem here would be quite different if the Act envisaged stockyards as strictly private enterprise. But, as noted, Congress planned differently. The Senate Report proclaimed that these 'great public markets' are 'public utilities.' . . . The House Report, in the same vein, placed this regulation of the stockyards on a par with the regulation of the railroads."

In *Texas & Pac. R. Co. v. Abilene Cotton Oil Co.*, 204 U. S. 426, 51 L. Ed. 553, 27 S. Ct. 350 (1907), a case involving railroads, the United States supreme court established the doctrine of primary jurisdiction. A claim by an oil company to recover charges paid in excess of those which were just and reasonable was under consideration.

The action, commenced in a district court, resulted in a recovery by the oil company. On review before the supreme court, the railroad company contended that the matter of rates was within the primary jurisdiction of the Interstate Commerce Commission, while the oil company relied upon those sections of the Interstate Commerce Act which were substantially the same as § 209 (b) of the Packers and Stockyards Act, and provided:

" 'That any person or persons claiming to be damaged by any common carrier subject to the provisions of this act may either make complaint to the Commission, as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this act, in any District or Circuit Court of the United States of competent jurisdiction; . . . [§ 9]
" '. . . *Nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies* [§ 22].' " (Italics ours.)

The United States supreme court rejected the oil company's contention. It held that, since one of the purposes of the act was to attain uniformity of rates, a shipper seeking reparation predicated upon the alleged unreasonableness of the established rate must first invoke the jurisdiction of the commission. Uniformity of practices is one of the purposes of the Packers and Stockyards Act, and it too can be attained only by application of the primary jurisdiction doctrine. What was said by the circuit court of appeals in *Kelly v. Union Stockyards & Transit Co. of Chicago, supra,* is apposite here:

"To say, however, that the primary jurisdiction doctrine is applicable to cases arising under the Packers and Stockyards Act is not to say that it applies to defeat the jurisdiction of the courts in all such cases, for the Supreme Court has clearly indicated that the doctrine is operative only in certain classes of cases, those in which 'the inquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission.' Great Northern Ry. v. Merchants Elevator Co., 259 U. S. 285, 291, 42 S. Ct. 477, 479, 66 L. Ed.

943. *The decisive question, then, is whether this is such a case."* (Italics ours.)

The affirmative answer to the question posed by the *Kelly* case is also decisive of the case at bar.

The gravamen of the wrong alleged here is not the breach of a contract, express or implied. Nor can it be a tort when the acts complained of have been performed pursuant to the lawful authority of an administrative body. Likewise, the appellants have alleged no facts which entitle them to any equitable relief. The gravamen of this claim is that the Secretary of Agriculture, in the exercise of his authority, has deprived the appellants of the privilege of conducting their businesses in the respondent's stockyard. The appellants must look to the Packers and Stockyards Act, under which they were licensed to do business in respondent's stockyard, for any relief to which they may be entitled as a result of the authorized change in respondent's method of selling. It is only when the acts complained of constitute a wrong independent of the Packers and Stockyards Act that the jurisdiction of the courts may be initially invoked, pursuant to § 209(b) of the act. See *De Vries v. Sig Ellingson & Co.*, 100 F. Supp. 781 (1951); *Citizens State Bank of Dalhart v. Farmers Union Livestock Cooperative Co.*, 165 Kan. 96, 193 P. (2d) 636 (1948); *Birmingham v. Rice Bros.*, 238 Iowa 410, 26 N. W. (2d) 39, 2 A. L. R. (2d) 1108 (1947); *Mason City Production Credit Ass'n v. Sig Ellingson & Co.*, 205 Minn. 537, 286 N. W. 713 (1939); *Carnes v. St. Paul Union Stockyards Co.*, 164 Minn. 457, 205 N. W. 630, 206 N. W. 396 (1925).

A "practice" of the livestock industry is a technical matter, and uniformity can be secured only if controversies arising out of such "practices" are resolved by the Secretary of Agriculture, and reviewed pursuant to the statutory method which Congress has provided.

Because of our disposition of this case, we do not reach appellants' remaining assignments of error.

The judgments are affirmed.

FINLEY, C. J., MALLERY, HILL, DONWORTH, and HUNTER, JJ., concur.

FOSTER, J., dissents.

WEAVER and ROSELLINI, JJ., did not participate.