[No. 67301-7-I.   Division One.   December 10, 2012.]

MARY SEBEK ET AL., *Appellants*, v. THE CITY OF SEATTLE ET AL., *Respondents*.

274

*Brian A. Knutsen, Eric D. "Knoll" Lowney*, and *Claire E. Tonry* (of *Smith & Lowney PLLC*) (*Jason Stavers* and *George A. Nicoud III* of *Gibson, Dunn & Crutcher LLP*, of counsel), for appellants.

*Peter S. Holmes, City Attorney*, and *Gregory C. Narver, Assistant*, for respondent City of Seattle.

*Paul J. Lawrence, Gregory J. Wong*, and *Kymberly K. Evanson* (of *Pacifica Law Group LLP*), for respondent Woodland Park Zoological Society.

¶1 SPEARMAN, J. — In general, a taxpayer has standing to sue a municipality when the municipal entity acts illegally. Here, Mary Sebek and Nancy Farnam filed a taxpayer action against the city of Seattle (City), arguing that the Woodland Park Zoo's (Zoo) housing of elephants violated state and local animal cruelty laws. However, while Sebek and Farnam's complaint alleged that the Woodland Park Zoological Society (Zoo Society) acted illegally, it did not identify any illegal acts committed by the City. Additionally, the operating agreement between the City and the Zoo Society makes it clear that the Zoo Society has exclusive control over operation of the elephant exhibit. As such, the trial court properly dismissed the case under CR 12(c) for lack of standing. We affirm.

### FACTS

¶2 In March 2002, the City entered into a long-term contract (Agreement)[1] with the Zoo Society to "manage and operate the Zoo as a state-of-the-art zoo, . . . with emphasis on the Zoo's scientific and educational purposes and programs."[2] Under the Agreement, the City owns the land on which the Zoo operates, while the Zoo Society owns and cares for the animals exhibited there.

¶3 In exchange for the Zoo Society's agreement to operate, manage, and maintain the Zoo, including employment and supervision of all zoo employees, the City contractually committed to financial support of the Zoo designated generally for "operations" and "maintenance." No city funds are dedicated to the display of elephants or of any particular animal. The City plays no role in deciding what animals to exhibit, what animals to acquire or sell, or how the animals are to be exhibited or cared for at the Zoo. As the complaint acknowledges, the Zoo Society "exclusively manages and operates the Zoo."

¶4 The Zoo Society is accredited by the Association of Zoos and Aquariums (AZA). The Agreement requires Woodland Park to care for the Zoo's animals in accordance with

---

[1] The Agreement is alternatively referred to by the parties as the "Management Agreement" or the "Zoo Agreement."

[2] The Agreement was authorized by RCW 35.64.010 (authorizing cities to enter into agreements with nonprofit corporations to operate, among other things, zoos), and by Seattle City Council Ordinance 120697 (Dec. 2001). In general, when ruling on a CR 12(b)(6) or CR 12(c) motion to dismiss, the trial court may only consider the allegations contained in the complaint and may not go beyond the face of the pleadings. *Brown v. MacPherson's, Inc.*, 86 Wn.2d 293, 297, 545 P.2d 13 (1975). Where a plaintiff, however, founds allegations in a complaint on specific documents, but does not physically attach those documents to the complaint, said documents may be considered in ruling on a CR 12(b)(6) or CR 12(c) motion for judgment on the pleadings. *See, e.g., In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) (appropriate for trial court to consider other portions of a document referenced in a complaint in a motion to dismiss, and doing so does not convert the motion into one for summary judgment). Here, the complaint repeatedly cites to the Agreement and the parties appear to agree that the trial court properly considered the Agreement in ruling on the motion.

AZA standards. The complaint does not allege the Zoo has failed to meet AZA standards.

¶5 Mary Sebek and Nancy Farnam (hereinafter collectively Sebek) sued the City, claiming the City's contractual payments to the Zoo Society are illegal government expenditures because the Zoo Society's care of its elephants allegedly violates Washington's criminal animal cruelty statute, RCW 16.52.207, and Seattle's criminal animal cruelty ordinance, Seattle Municipal Code (SMC) 9.25.081. The Zoo Society intervened. The City moved for dismissal under CR 12(c) on grounds that Sebek did not have standing to sue the City. The trial court agreed and granted the motion to dismiss. Sebek appeals.

## DISCUSSION

■ ¶6 *Taxpayer Standing*. Sebek argues the trial court erroneously concluded she does not have standing as a taxpayer to challenge the City's payments to the Zoo, and as such, dismissal under CR 12(c) must be reversed. "Ordinarily, an individual taxpayer must show special injury in order to sue a municipality." *Eugster v. City of Spokane*, 139 Wn. App. 21, 28, 156 P.3d 912 (2007) (citing *Am. Legion Post No. 32 v. City of Walla Walla*, 116 Wn.2d 1, 7-8, 802 P.2d 784 (1991)). Where a municipality acts illegally, however, standing is established because "every taxpayer is presumed injured" in such a case. *Id*.

¶7 Here, the alleged illegality is violation of RCW 16.52.207(1) and (2) and SMC 9.25.081. RCW 16.52.207(1) provides that a person "is guilty of animal cruelty in the second degree if . . . the person knowingly, recklessly, or with criminal negligence inflicts unnecessary suffering or pain upon an animal." Under subsection 2(a), an "owner" of an animal is guilty of animal cruelty if the owner "[f]ails to provide the animal with necessary shelter, rest, sanitation, space, or medical attention and the animal suffers unnecessary or unjustifiable physical pain as a result of the

failure." SMC 9.25.081(A) and (F) make it a crime to "physically mistreat any animal" "or confine any animal in such a manner or in such a place as to cause injury or pain . . . or to keep an animal in quarters . . . that are of insufficient size to permit the animal to move about freely."[3]

¶8 The City argues that dismissal was proper because nowhere in the complaint does Sebek allege that the City has violated RCW 16.52.207 or SMC 9.25.081(A); rather, the complaint repeatedly alleges "the Zoo" (i.e., the Zoo Society) violated these laws. *See generally* Compl. ("At the heart of this lawsuit are five elephants, the victims of the Zoo Society's illegal and wrongful conduct"; "Because of the Zoo's facilities and practices, [the elephants] have sustained significant injuries to their feet and joints"; "The Zoo's elephant exhibit is too small to allow the Zoo's elephants to roam or to engage in their natural foraging behavior"; "The surface of the barn in the Zoo's elephant exhibit is inherently harmful to the sensitive feet of the Zoo's elephants"; "Because of the Zoo's practices and the cold and rainy conditions at the Zoo, the Zoo's elephants spend much of their time in the elephant barn"; "The Zoo's practices, described throughout this Complaint, combined with the Zoo's limited space, have caused the elephants severe psychological trauma.").

¶9 Sebek argues, however, that even if the Zoo Society is the party actually violating the animal cruelty laws, it is the City's funding that enables the Zoo Society to do so. She contends, in effect, that the City's act of providing funding to the Zoo Society, along with its knowledge of the alleged law violations, makes the City vicariously liable for the Zoo Society's alleged criminal acts. Based on this claim, Sebek asserts she has taxpayer standing to challenge the funding provided to the Zoo Society.

---

[3] We have no occasion herein to address the merits of Sebek's allegations, and we express no opinion thereon.

¶10 In support of this argument, Sebek relies on *State ex rel. Boyles v. Whatcom County Superior Court*, 103 Wn.2d 610, 694 P.2d 27 (1985), which she claims "controls this appeal." Sebek contends that *Boyles* stands for the proposition that where a third party, in contract with the government, engages in illegal conduct, the government cannot hide behind that third party to defeat taxpayer standing. But Sebek misreads the case. In *Boyles*, a taxpayer sued to enjoin county officials from assigning prisoners to a work release program operated by a religious organization because attendance at religious services was mandatory for all program participants. The trial court dismissed the suit based on the county's argument that Boyles lacked standing to challenge the use of county personnel to make the assignments. On appeal, the Washington Supreme Court reversed, holding that Boyles had standing to vindicate the "right to be protected from official *governmental* acts which favor one religion over another." *Id.* at 614 (emphasis added).

¶11 Thus, Boyles had standing because she alleged the *county* was engaged in the unlawful activity of favoring one religion over another. But here, Sebek's complaint alleges only that the Zoo Society is engaged in illegal activity and, unlike Boyles, it does not allege or identify any acts by the City that are in violation of any statute or ordinance. Sebek contends that the City's financial support of the Zoo Society is unlawful, but she does not dispute that the payments are made under a contract that is specifically authorized by RCW 35.64.010, which governs contracts for management and operation of zoos and aquariums. Nor does Sebek allege in her complaint that the Agreement itself is illegal. Because her complaint fails to allege any illegal governmental acts, *Boyles* is of no help to Sebek.

¶12 In her reply brief, Sebek claims that the complaint sufficiently alleges illegal activity by the City because the complaint asserts that the City "retains ownership and control" over the zoo property. The argument is without

merit. Sebek supports her claim that the City retains control over the Zoo's operations only by citation to the "Zoo Agreement, Recitals." But the recitals merely state that the City retains control "through the conditions outlined in this Agreement." And the Agreement makes it clear that the Zoo Society "shall exclusively manage and operate the Zoo." For example, the Agreement provides that "[the Zoo Society] shall exclusively manage and operate the Zoo"; and that "[a]ll Zoo animals currently owned by the City and all rights to animals acquired during the term of this Agreement . . . shall be the sole property of [the Zoo Society], which shall also assume all obligations the City may have with respect to animals exhibited, housed, or otherwise kept or cared for at the Zoo during the term of this Agreement."

¶13 Sebek also contends that the "control provisions built into the Agreement" show the City has control over the acts of the Zoo and its employees. But the provisions cited by Sebek do not give the City control over operations at the Zoo. Rather, they require the Zoo Society to maintain veterinary records regarding care of zoo animals, which is to be "consistent with the requirements of [the] Agreement." On this issue, the Agreement simply requires that the Zoo Society maintain accreditation with the AZA, an issue that is not in dispute in this case. *See* Compl. at 4 ("The Zoo is accredited by the Association of Zoos and Aquariums."). And as is described above, the Agreement makes it clear that the Zoo Society has the "exclusive power" to control the operations at the Zoo.

¶14 In short, the complaint here failed to allege that the City acted illegally. As such, Sebek did not have taxpayer standing, and the trial court properly dismissed the case.

¶15 *De Facto City Agency*. Sebek also appears to argue that the Zoo Society is a de facto city agency. But the trial court here never had an opportunity to address this theory of the case because Sebek never made the argument to the trial court. Instead, Sebek briefed the argument for the first time on appeal. Generally, we will not address issues raised for the first time on appeal. RAP 2.5(a).

¶16 But even if we were to consider the issue, we would reject Sebek's argument. The question of whether an entity operates as an "arm" of a governmental agency or a "de facto" part of a government agency turns on whether the agency exerts a "right of control" over the entity. *Dolan v. King County*, 172 Wn.2d 299, 312-13, 258 P.3d 20 (2011). In *Dolan*, the Supreme Court concluded that the public defender agencies were de facto agencies of King County, based largely on the right the county had to control the agencies, including "stringent control over the defender organizations' formal structure." *Id.* at 319. Here, unlike in *Dolan*, the Agreement makes it clear the Zoo Society controls what exhibits are to be displayed, how they are to be displayed, what animals the Zoo Society decides to purchase, and how the Zoo Society decides to care for the animals. We reject Sebek's arguments on this issue.[4]

¶17 Affirmed.

LEACH, C.J., and BECKER, J., concur.

Reconsideration denied January 11, 2013.

Review denied at 177 Wn.2d 1014 (2013).

---

[4] In light of our decision, we decline to address the City's policy arguments against application of taxpayer standing.